# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**NORTHWOOD PROPERTIES, LLC,**<br><br>                              **Debtor**<br>---<br>**MARK G. DEGIACOMO, as Chapter 7 Trustee,**<br><br>                              **Plaintiff**<br>**v.**<br><br>**TASHMOO COVE REALTY, INC.,**<br><br>                              **Defendant** | **Chapter 7**<br>**Case No. 05-18880-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 10-1314** |

## MEMORANDUM OF DECISION

By his complaint in this adversary proceeding, Mark G. DeGiacomo (the "Trustee"), as chapter 7 trustee in the bankruptcy case of Northwood Properties, LLC (the "Debtor" or "Northwood"), seeks damages against defendant Tashmoo Cove Realty, Inc. ("Tashmoo") for breach of plan funding obligations to which, the Trustee contends, Tashmoo committed itself. Specifically, the Trustee contends that, as owner of the Debtor and a proponent of Debtor's confirmed-but-failed chapter 11 plan, and in order to obtain confirmation of that plan, Tashmoo promised to fund payment of administrative expense claims to the extent of $2 million if necessary, and that the court relied on that promise in confirming the plan. After a trial and on the basis of the findings and rulings set forth below, the Court finds that Tashmoo made no such promise. Accordingly, judgment will enter for Tashmoo.

**Procedural History**

On September 22, 2005, Northwood filed a petition for relief under Chapter 11 of the

Bankruptcy Code.  The history of the chapter 11 phase of the case will be detailed in the Court's findings

of fact.  It suffices here to note that the Debtor obtained confirmation of a plan of reorganization but

encountered insurmountable obstacles thereafter, as a consequence of which it voluntarily converted

the case to one under chapter 7.  Mark DeGiacomo was appointed chapter 7 trustee and continues to

serve in that capacity.

On November 5, 2010, the Trustee filed the complaint commencing this adversary proceeding.

The complaint asserts four counts, each for payment by Tashmoo of the balance of the Debtor's

otherwise unfunded chapter 11 administrative expenses.  These consist principally of the fees and

expenses of the law firm of Riemer & Braunstein LLP for its representation of the Debtor while this case

was in chapter 11.  Count I seeks this relief on a breach-of-contract theory, Count II on the basis of

promissory estoppel, Count III on the basis that Tashmoo's funding of the administrative expenses was a

condition of plan confirmation, and Count IV on the basis of "equitable estoppel to deny a judicial

admission."  Tashmoo opposes the relief requested.  The matter was tried over three days, after which

the parties submitted proposed findings of fact and conclusions of law and then made final arguments.


**Findings of Fact**

As demonstrated by Tashmoo's proposed findings of fact and the Trustee's reply thereto, only

few of the underlying facts are in dispute.  I make the following findings of fact.

**A.      Events Leading to Northwood's Bankruptcy Filing**

1.      On or about December 26, 2000, Tashmoo formed Northwood, a Massachusetts limited

liability company, to which it assigned all of the assets it had purchased from Northwood at Sudbury

Realty Corp. ("NSRC"), the debtor in an earlier bankruptcy case, Case No. 00-14967-CJK, pursuant to a

joint plan of reorganization filed by NSRC and Tashmoo dated October 11, 2000 (the "NSRC Plan").

2.      The assets consisted primarily of a partially constructed real estate development in

Sudbury, Massachusetts, which contemplated a total of six buildings and sixty-six condominium units in

five construction phases (the "Development").

3.      Tashmoo was the sole member of Northwood and at all times exercised full control of

Northwood, through its President, Ross Hamlin ("Hamlin").

4.      After purchasing the Development, Northwood finished seven remaining units in what

was known as Building 10, constructed what is known as Building 20, and completed certain site work

and infrastructure at the Development, including the site work and infrastructure related to the

clubhouse.

5.      Tashmoo loaned $6,332,482.28 to Northwood over the course of development of the

project and through the Filing Date (as defined below), reflected by a series of notes payable.  Tashmoo

had advanced the funds comprising its prepetition claim over a period of five years for the purpose of

developing the project.

6.      While construction of the first two phases of the Development was in progress, three

individuals, including one Ralph Tyler (collectively, the "Objectors"), initiated litigation in various fora

challenging Northwood's efforts to develop its property and to sell its units, including pursuing an

appeal of the issuance of the building permit of Northwood by the Sudbury Planning Board.

7.      While Northwood ultimately agreed to pay a substantial sum to settle with the

Objectors, the delays and cost associated with defending the litigation made it impossible for

Northwood to complete all five phases of the Development by the time Northwood's construction

phasing rights ("Phasing Rights") were set to expire in December, 2005.

8.      Mr. Hamlin, the manager of Northwood, consequently sought advice from Riemer &

Braunstein LLP ("Riemer") regarding the filing of a Chapter 11 bankruptcy of Northwood and ultimately

engaged Riemer to commence a bankruptcy proceeding on the Debtor's behalf, which Alan Braunstein

("Braunstein"), a partner at Riemer, testified was "envisioned to be a very, very quick bankruptcy" despite acknowledging that the process would need to address the Debtor's "one recalcitrant creditor," Ralph Tyler.

**B.      Commencement of the Bankruptcy Proceeding**

9.      On September 22, 2005 (the "Filing Date"), Northwood filed a voluntary petition for relief under Chapter 11.

10.      Mr. Hamlin continued to serve as both a manager of Northwood and the President of Tashmoo after the Filing Date, and he consequently exercised control over the operations of Northwood as a debtor-in-possession.

11.      The bankruptcy proceeding that Riemer envisioned would be speedy turned out to be anything but, as dealing with the Objectors proved to be overwhelming. As Mr. Braunstein testified, "[t]hey were absolutely out there to try to thwart the efforts of the debtor to reorganize," filing pleading after pleading, tying up Riemer's voicemails, and generally being disruptive.

**C.      Tashmoo's Claim**

12.       Tashmoo advanced funds to Northwood both before the Filing Date and after, and it made the latter advances both before Northwood obtained confirmation of a plan of reorganization and after.

13.      As of the Filing Date, Northwood owed Tashmoo the sum of $6,332,482.28, making Tashmoo the largest creditor of Northwood's estate by far.

14.      Additionally, from the Filing Date through June 5, 2006, Tashmoo advanced a further $836,661.43 to or on behalf of Northwood.  This post-confirmation advance was a loan that Tashmoo had funded at the request of the Debtor for a limited purpose.

15.      Tashmoo agreed that its claim would be subordinated, and its claim was treated as subordinated in every plan iteration filed by the Debtor.

16.     Although Tashmoo had been the only source of funding for Northwood over the years, by the commencement of Northwood's bankruptcy, Tashmoo had become reluctant to lend or invest more money on the project.

**D.      The Tyler Claim**

17.      Mr. Tyler, one of the objecting parties and thorns in the sides of the Debtor and Riemer, filed a claim in the Debtor's bankruptcy case in the amount of $622,270 (the "Tyler Claim"), to which the Debtor objected.

18.     The Debtor, through Riemer, steadfastly maintained that the likelihood of the disputed Tyler Claim ultimately being approved by the Court was zero; and, based on such assurances, Hamlin and Tashmoo understood, at all relevant times, that the likelihood the claim would be allowed was practically non-existent.

19.     In fact, Mr. Braunstein testified that "in each and every iteration of that projection [as to the likelihood of Mr. Tyler's succeeding in his quest for $622,000] the debtor projected that he would be unsuccessful in the quest."  Mr. Braunstein confirmed that his view on the improbability of allowance of the Tyler Claim never changed during the course of the case.

**E.      The Plans of Reorganization and Related Pleadings**

20.     As of the Filing Date, the Debtor had the following assets: the Unisys settlement in the approximate amount of $140,000; $17,244 cash on hand; the model condominium unit; development rights for 42 condominium units in the Development; and reimbursement of a bond in the amount of $42,000 from the Town of Sudbury.

21.     On March 23, 2006, Northwood and Tashmoo, as "co-proponents," filed a Chapter 11 Plan of Reorganization (the "First Plan").

22.     The First Plan was amended by the First Amended Chapter 11 Plan of Reorganization of Northwood Properties, LLC Proposed Jointly By Northwood Properties, LLC and Tashmoo Cove Realty, Inc. dated May 10, 2006 (the "First Amended Plan").

23.     Riemer, as counsel to the Debtor and only in that capacity, was the sole signatory to both the First Plan and the First Amended Plan.

24.     The rationale behind Riemer's filing the amended plan was, as Mr. Braunstein testified, that "[e]ach time that an objection was filed to the plan, we amended accordingly to try to deal with the objection."

25.     Both the First Plan and First Amended Plan identified identical funding sources for Allowed Claims.  Both plans indicated that Allowed Claims would be paid through a combination of the following:  (a) remaining funds Debtor received from the Unisys Corporation pursuant to the settlement agreement; (b) a portion of the sale of each condominium unit sold from the remaining three phases of [the Development]; (c) a portion of any future sale of the Phasing Rights, together with all rights incident thereto, as may be necessary to pay all Allowed Claims in accordance with Section 4 of the Plan; and/or (d) cash proceeds from the prosecution or settlement of any Causes of Action.

26.     Additionally, both plans contained two classes of unsecured claims—Class 1 consisting of all general unsecured creditors other than Tashmoo, including the claims of the Objectors, Ralph Tyler, Claude Delise, and Sydney Bourne, and Class 2 containing only Tashmoo.

27.     The First and First Amended Plans proposed to fund distributions to classified claims in their entirety from  "Distributable Cash," which was defined as "unrestricted funds held by the Reorganized Company as of the Effective Date, any unrestricted funds acquired thereafter, and any interest earned on unrestricted funds of the Reorganized Company, less the amount of such funds paid on account of Allowed Administrative Claims, Bankruptcy Fees, Allowed Fee Claims, Allowed Priority Non-Tax Claims and Plan Expenses."

28.     Both the First Plan and the First Amended Plan further provided that the Distributable

Cash would provide a five percent (5%) dividend of the amount of all Allowed Claims in Class 1 on the

Initial Distribution Date, and further distributions thereafter as Distributable Cash became available until

all claims were paid in full or all sources of Distributable Cash were exhausted.

29.     While both the First Plan and First Amended Plan provided for similar treatment of

unsecured claimants in Classes 1 and 2, the First Amended Plan provided additional information

regarding anticipated timing and specific sources of funding regarding each distribution wave, providing

as follows with respect to unsecured claims in Class 1:

> The first interim distribution to Class 1 Claimants will take place on the Initial
> Distribution Date, projected to be on or about July 15, 2006 from the cash on
> hand which consists primarily of the net proceeds of the Unisys Settlement in an
> amount equal to five percent (5%) of the amount of any Claim.
>
> Thereafter, Class 1 creditors will further be paid from the allocated net proceeds
> upon each sale of individual condominium units when completed a sum not less
> than 10% of the net proceeds from each unit sold commencing in 2007 with the
> aggregate payments equaling 100% plus interest to all allowed Class 1 creditors
> on or before 2009.
>
> In the event the Debtor sells the Phasing Rights for a cash offer, pursuant to the
> sale provisions of the Bankruptcy Code, in an amount equal to at least three
> million dollars ($3,000,000.00), then the proceeds of the sale after costs of
> closing and payment (or reserves) for Administrative Expenses, will be paid to
> Class 1 Allowed Claimants within ten (10) days of the closing in an amount equal
> to the full amount of each Allowed Unsecured Claim plus interest.

30.     On July 11, 2006, the Debtor filed its Second Amended Chapter 11 Plan of

Reorganization of Northwood Properties, LLC Proposed Jointly By Northwood Properties, LLC and

Tashmoo Cove Realty, Inc.

31.     Approximately 25 minutes before the Debtor filed its Second Amended Plan

electronically, the Objectors filed an objection to the First Amended Plan with the Clerk's Office (the

"Confirmation Objection"), which Confirmation Objection was entered on the docket on July 12, 2006.

32.     The Second Amended Plan enumerated its funding sources with specificity as follows:

(a) remaining funds Debtor received from the Unisys Corporation pursuant to the settlement agreement; (b) net proceeds from the sale of each condominium unit sold from the remaining three phases of [the Development]; (c) a portion of any future sale of the Phasing Rights, together with all rights incident thereto, as may be necessary to pay all Allowed Claims in accordance with Section 4 of the Plan; (d) recovery of the bond from the Town of Sudbury; and/or (e) Cash proceeds from the prosecution or settlement of any Causes of Action [collectively, the "Funding Sources"].

33.    The Second Amended Plan included only one additional funding source from those previously listed in the First Plan and First Amended Plan:  the bond proceeds from the Town of Sudbury.

34.    In the Section entitled "Means for Implementation of the Plan," at § 5.1, the Second Amended Plan again provided that claims would be paid from the Funding Sources described in Article 4 of the Second Amended Plan, and it specified no other sources of funding for plan distributions.  These were to be the only sources of funds available for the Plan-required distributions to creditors as described in Article 4 of the Second Amended Plan.

35.    The Funding Sources set forth in the "Summary of Plan" sections in all of the three plans filed by the Debtor never included any funding, whether a loan or otherwise, by Tashmoo.

36.    Under the Second Amended Plan, all nominal claims of the Objectors were placed in a "convenience class" and were to be paid in full on the Initial Distribution Date, rendering them unimpaired.

37.    The Second Amended Plan also separately classified the $622,270 Tyler Claim, providing for payment in full of the Tyler Claim in the amount as allowed—if it were ever allowed—thereby rendering Mr. Tyler unimpaired.

38.    Accordingly, as of the Effective Date of the Second Amended Plan, the convenience class claims and the Tyler Claim needed to be paid in full or as soon as allowed with interest.

39.     This was the first time that the cash needs to satisfy Plan distribution obligations to claimants, as of the Effective Date, increased by an amount equal to the $622,270 Tyler Claim amount, if and to the extent that the Tyler Claim were allowed.  In the First and First Amended Plans, the initial distribution due to unsecured creditors, including Mr. Tyler, had only totaled five percent of approximately $2.1 million in claims, or $105,000, an amount of cash which the Debtor at all times had on hand.

40.     The Debtor and Riemer consistently maintained that the likelihood of the disputed Tyler Claim's ultimately being approved by the Court was zero; and, based on such assurances, Tashmoo understood that the likelihood that Tyler's claim would be allowed was practically non-existent. Furthermore, this belief was bolstered because this prediction was specifically set forth in every disclosure statement filed in the case.

41.     The Second Amended Plan's treatment of administrative claims is identical to the treatment of administrative claims in prior versions of the plans.  The Second Amended Plan states that each holder of an allowed "Administrative Claim" was to be paid in cash on the "Initial Distribution Date, or as soon as practicable after such Administrative Claim becomes an Allowed Administrative Claim," or receive such other treatment as may be agreed upon by the Debtor and the claimant.

42.     Under the Second Amended Plan that was confirmed, as under all prior iterations of that plan, the claims of professional persons for  compensation and reimbursement of expenses constituted "Administrative Claims," despite the separate definitions of "Fee Claim" and "Administrative Claim."

43.     Additionally, Section 2.3 of the Second Amended Plan (and of each prior iteration of the Plan) set forth a procedure for the filing and allowance of fee claims but did not also specify how or when Fee Claims were to be paid.  Fee Claims were therefore subject to the section of the Second Amended Plan that governed payment of Allowed Administrative Claims, Section 2.1(c), which stated as

follows: "Each holder of an Allowed Administrative Claim shall receive either: (i) the amount of such

holder's Allowed Claim in one Cash payment on the Initial Distribution Date, or as soon as practicable

after such Administrative Claim becomes an allowed Administrative Claim by the passage of time or by

Final Order of the Bankruptcy Court; or (ii) such other treatment as may be agreed upon by the Debtor

or the Reorganized Company and such holder[.]"

44.     This same payment scheme for Administrative Claims existed in every single iteration of

the plan.  At no time did the Debtor have sufficient funds on hand to satisfy administrative professional

fees, yet the idea of a Tashmoo loan never came up at any time prior to the classification scheme

ultimately changing in the Second Amended Plan to separately classify, and render unimpaired, the Tyler

Claim.  Rather, the Tashmoo loan concept was introduced for the first time when, in order to diffuse the

objections of the one party "absolutely out there to try to thwart the efforts of the debtor to

reorganize," who gave rise to "frustration" because he was "disruptive," as well as "disconcerting" and

who "inundated, inundated, [the Debtor] with pleadings," the Tyler claim was rendered unimpaired,

whereupon it became necessary to offer up a source of payment for that claim.

45.     Again, the Second Amended Plan itself nowhere required that administrative fee claims

be paid on the Effective Date or the Initial Distribution Date; it provided that payment of these claims

would be made on the Initial Distribution Date or as soon thereafter as is practicable.  As Mr. Hamlin

testified, "practicable" meant as soon as the Debtor had the money to make the payment.

46.     On July 13, 2006, the Debtor filed a Motion of Northwood Properties, LLC (1) for

Authority to Sell Development Rights and Existing Model Unit by Private Sale and to Assign Certain

Contracts Pursuant to Sections 363 and 365 of the Bankruptcy Code; and (2) to Approve Payment of

Break-Up Fee; and (3) to Approve Form of Notice and Bidding Procedures ("Sale Motion").

47.     Through the Sale Motion, the Debtor requested Court approval of the proposed sale of

its Phasing Rights to a third-party developer for consideration of $3 million.

48.      In the Sale Motion, the Debtor also represented that: "the sale will generate sufficient funds to pay all creditors of the Debtor's estate in full to the extent such claims are or become allowed claims presuming the Plan is confirmed, except to those creditors willing to assent to the Sale and accept the treatment of their respective claims as proposed in the Plan."

49.      In support of confirmation, Riemer prepared and filed an Offer of Proof on July 17, 2006 (the "Offer of Proof").

50.      The Offer of Proof filed by the Debtor was the first document since the filing of the Second Amended Plan that described the rationale behind the modification of the First Amended Plan.

51.      The Offer of Proof provided that "[b]y virtue of the modification (which treatment provides that Class 1 and Class 2 Claimants are unimpaired), each Class that is impaired under the Plan has accepted the Plan. Section 1129(a)(8)."

52.      The Offer of Proof also expressly acknowledged that the Second Amended Plan's success was "dependent on the disposition of the Property through development and sales of condominium units or a sale of the Property and the proceeds of any sale or sales are sufficient to satisfy the proposed treatment of all Allowed Claims as set forth in the Plan, and accordingly, confirmation of the Plan is not likely to be followed by the need for further reorganization. Section 1129(a)(11)."

53.      The "Allowed Claims" referred to in the Offer of Proof that were reliant upon disposition of the Property for satisfaction expressly included Administrative Claims such as professional fees. Under the confirmed Second Amended Plan and all prior iterations of the plan, Claims were defined to include any claims arising before the Effective Date of the Plan.   See Second Amended Plan, § 1.20 ("Claim means a claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtor that currently exists or arises before the Effective Date").  Again, the Claims dependent upon Property disposition were not just prepetition claims, but were all claims arising before the Effective Date, which would include administrative professional fee claims.

54.     Tashmoo is not listed as either a guarantor or a source of funds in the Offer of Proof. Moreover, the plan funding sources as set forth in all versions of the plans and the Offer of Proof did not include a Tashmoo loan or other Tashmoo-provided cash infusion.

**F.      The Confirmation Hearing**

55.      On July 18, 2006, the Bankruptcy Court (Somma, U.S.B.J.) conducted an evidentiary hearing to determine whether or not the Second Amended Plan would be confirmed (the "Confirmation Hearing").

56.     As of the time of the Confirmation Hearing, the Sale Motion, which contemplated a sale of the Debtor's Phasing Rights for consideration of $3 million, would generate sufficient funds to pay all allowed claims in full presuming the Second Amended Plan was confirmed, was pending.

57.     Confirmation of the Second Amended Plan was vigorously opposed at the Confirmation Hearing by the same Objectors characterized at trial as bent on preventing confirmation, frustrating and disconcerting, who argued that the Plan was not feasible.  At the Confirmation Hearing, the Objectors orally identified as their primary feasibility challenge how the Debtor was to come up with the $622,270 necessary to render Mr. Tyler's claim unimpaired.

58.     At the Confirmation Hearing, the sole testifying witness for the Proponents was Mr. Hamlin, in his capacity as manager of Northwood.

59.     When Debtor's counsel asked Mr. Hamlin, "[o]f those claims which does the modified plan intend to pay at or near the effective date of the plan," he responded, "Bourne, Tyler, Delise on the small claims, the --I guess the convenient (sic) class claims, Tyler on the legal fee claims, and there'll be some payments to the association. Nothing is paid to Tashmoo, and some sort of and--we've discussed this with the--with the lawyers involved who will come to an arrangement as to how to pay out those claims from the proceeds of sale and maybe something [unclear word, voice dropped]."

12

60.     After refreshing Mr. Hamlin's recollection that Mr. Tyler's claim was only payable in the event of allowance, Debtor's counsel asked whether the Debtor had the ability to make the contemplated initial five percent dividend to the Association required under the Second Amended Plan plus satisfy the convenience claims, assuming Mr. Tyler's claim was disallowed, to which Mr. Hamlin responded, "[y]es, the debtor currently has approximately $140,000 in the bank."

61.     When asked "what other assets … the debtor [had] available to it should it need to pay, for example, all of the administrative expenses at the time of the effective date," Mr. Hamlin responded that the Debtor had a condo unit that it could finance to raise "about $360,000 in cash."

62.     However, the Debtor only had $140,000 readily available.   The condo unit refinancing that had been referenced had not been applied for and, if applied for, might not be approved. Moreover, negotiations were still ongoing with respect to the condo association escrow funds.

63.     Mr. Hamlin testified that he had an "understanding of what the debtor's potential maximum exposure for administrative claims is, at least as of today," and that the maximum exposure was "[p]robably between 450 and $500,000 at the outside."

64.     Asked again as to what the Debtor would do if the professionals insisted on effective date payment, Hamlin responded, "[m]y understanding is that the administrative claimants will not be insisting on immediate payment."

65.     Hamlin then stated that he expected to be able to reach an agreement with the Professional Fee claimants for payment of their Professional Fee claims in one of two potential ways, either "over time or from another source, like the—one of the other plan proponents."  He did not testify that any such agreement already existed.  There was no then-existing agreement for payment of administrative claims from any source other than the proceeds from sale of the Phasing Rights or of the condo units.

66.     In response to a "hypothetical" question posed by Debtor's counsel regarding how the Debtor would pay the Tyler Claim if it were allowed and the Debtor had insufficient cash to pay that claim in full upon allowance, Mr. Hamlin stated that "Tashmoo will loan up to one million dollars to the debtor, the shortfall in those amounts—if there's any shortfall in those amounts."

67.     The million dollar number was chosen to provide a buffer above the approximately $700,000 that would be due on the Effective Date, consisting of $3,000 in convenience class claims, the $75,000 initial distribution to the condo association representing five percent (5%) of its $1.5 million claim, and the $622,270 Tyler Claim in the event of its allowance.

68.     That testimony was immediately followed by a question as to whether Tashmoo had sufficient funds to cover what could be a $200,000 shortfall in the Debtor's available cash, to which Mr. Hamlin responded in the affirmative.  The reference to the $200,000 shortfall by Riemer (as the firm whose attorney posed this question to Hamlin) was not inadvertent, but rather it represented the shortfall in the Debtor's ability to meet its $700,000 effective date cash obligations from the $360,000 in potential condominium refinancing proceeds and the $140,000 cash on hand in the event that the Tyler claim were allowed in full.

69.     Tashmoo had been assured by Riemer that there was no chance that the Tyler Claim would be allowed, so it was unlikely that Tashmoo would have to fund any shortfall the Debtor had in paying the Tyler Claim.  Tashmoo was willing, however, to fund the money in what it was assured was the unlikely event that the claim were allowed.

70.     The loan referenced in Mr. Hamlin's Confirmation Hearing testimony had no connection to payment of administrative expenses.  The Confirmation Hearing Transcript nowhere provides, and no factual support exists, for the Trustee's contention that there existed on the date of the Confirmation Hearing or otherwise an undertaking that Tashmoo would fund administrative claims.  The Trustee seeks a finding to the effect that "Hamlin expressly testified that in the event of a shortfall, payment of

14

administrative expenses would be made over time or by another plan proponent – specifically Tashmoo, the only other plan proponent." I reject this proposed finding; Hamlin did not testify to this effect.

71.     Every reference to professional fee claims, no matter by whom made, carried with it an indication that there was no expectation of Effective Date payment and no then-existing agreement that Tashmoo would fund those claims; the plans all indicated that payment was to be made "as soon as practicable" after allowance, and every reference as to the timing beyond that was an indication of an expectation of future agreement.   At trial, even Mr. Braunstein confirmed that no final agreement had been reached as of the Confirmation Hearing as to a Tashmoo undertaking to fund professional fee claims.

72.     Rather, the first place a Tashmoo loan or funding of any sort came up was in testimony where the necessity of rendering the Tyler Claim unimpaired was at issue.

73.     For the first time, Mr. Tyler had been put in a class of his own, and in order to render him unimpaired, the Debtor needed to demonstrate the he would be paid in full if his claim were allowed and, no less importantly, when it was allowed.  There could be no timing issue as to payment of the Tyler Claim because the Objectors were still pressing their Confirmation Objection, despite the fact that the Second Amended Plan provided they would be paid in full, with interest, upon allowance of their claims.

74.     The Objectors did not similarly state an objection based on feasibility due to a perceived inability to pay administrative claims.

75.     Northwood had sufficient cash on hand and available liquidity to meet the Second Amended Plan's effective date cash obligations, which totaled somewhere in the range of $75,000 to $80,000 unless the Tyler Claim were allowed in full.

76.     During the Confirmation Hearing, Mr. Braunstein stated as follows:

Any payment made by the proponents or the debtor for services or expenses in connection with the case or in connection with the plan will be subject to

approval by the Court. There hasn't been a deadline yet established for submission of those fees and expenses, but the debtor has also testified that they would either be in - per agreement with the professionals, either a deferment or payment from the plan proponent, depending again, upon whatever agreement has been worked out definitively….

With respect to administrative fees, the only other administrative fees are, again, that of professionals dealt with earlier with respect to either agreement with respect to deferral or payment from a co-plan proponent.

77.      Thus, to address feasibility with respect to the requirements under 11 U.S.C. § 1129(a) relating to the allowance and payment of administrative claims, including fee claims, Mr. Braunstein stated that professional fees were going to be addressed through one of two potential options, either (i) with respect to deferral or (ii) from a plan proponent.

78.      Mr. Braunstein testified at trial that there was no indication at the Confirmation Hearing that a final agreement had been reached as to payment of administrative fees.

79.      The Court specifically found at the Confirmation Hearing that the "evidence adduced by the debtor makes clear that the debtor has the financial resources to make the payments required under the plan[.]"

**G.      The Confirmation Order**

80.       The Court entered an Order dated July 20, 2006 (the "Confirmation Order") confirming the Second Amended Plan.

81.      The Confirmation Order was drafted by Riemer in the first instance, circulated for comment to various parties-in-interest, including Tashmoo, and submitted to the Court by Riemer.

82.      In the Confirmation Order, as drafted by Riemer and as entered by the Court, the Court found that the Second Amended Plan had been proposed in good faith and was feasible, and that confirmation was not likely to be followed by the liquidation or by the need for further financial reorganization of Northwood.

83.    The Confirmation Order provides, among other things, that the Plan Proponents were authorized and directed (i) "to take any action necessary or appropriate to implement, effectuate and consummate the Plan in accordance with its terms", and (ii) "to perform all of [their] obligations under the Plan as and when such obligations are required to be performed."

84.    Paragraph 9 of the Confirmation Order specifically provides that "[p]ursuant to Bankruptcy Code Section 1142(b), the Court approves, and the Debtor is authorized and directed to execute, deliver and implement, the Plan, and any other documents thereto made in accordance that may be necessary or appropriate for the implementation or consummation of the Plan."

85.    The Confirmation Order, as drafted by Riemer and entered by the Court, indicates that the Plan, as modified by the Confirmation Order itself, was confirmed.  No reference was made in the Confirmation Order to any modification to the terms of the Plan by any testimony at the Confirmation Hearing.

86.    Nowhere in the Second Amended Plan, as confirmed by the Confirmation Order, or in the Confirmation Order itself, is there a reference to a Tashmoo loan or infusion as a funding source for the Second Amended Plan.

**H.    The Post-Confirmation Period**

87.     Northwood never completed construction of the three remaining phases of the Development after the Filing Date, nor did it sell the development rights prior to conversion of the Debtor's Chapter 11 case to a case under Chapter 7.

88.    The Amended Plan was never consummated.

89.    During the post-confirmation period, the Debtor engaged in negotiations with the Objectors, ultimately leading to an agreement in principle dated August 28, 2007, which was filed by Ralph S. Tyler as an attachment to the NW/BDT Settlement Agreement (With Redactions in support of

the Motion to Extend the Approval Deadline (Docket #516), and that would have resulted in withdrawal

of the Objectors' challenge to the Phasing Rights Motion and dismissal of appeals.

90.     Paragraph 3 of the Settlement Agreement conditioned its implementation on, among

other things, the filing by the Debtor of a form of amended plan that provided for the agreed-upon

treatment of the Litigant's claims, which were to be paid upon sale of the Phasing Rights.

91.     On October 15, 2007, Guy Moss from Riemer circulated a draft "Second Amended

Chapter 11 Plan of Reorganization Proposed Jointly by Northwood Properties, LLC and Tashmoo Cove

Realty, Inc. As Modified" to John J. Monaghan, counsel to Tashmoo (the "Draft Plan"), as well as a draft

form of motion seeking authority to file that modified plan.

92.     The Draft Plan, which was never approved for filing by the Debtor or Tashmoo,

contained language requiring Tashmoo to guaranty payment of professional fees, stating:

> (c) Security for certain Fee Claims. Each Allowed Fee Claim of any Professional
> Person who has served as counsel or special counsel to the Debtor shall (i) be
> guaranteed by Tashmoo and payable by Tashmoo upon demand or on such
> terms as Tashmoo and the Professional Person shall agree upon, and (ii) be
> secured by (A) a first mortgage on the Condominium Unit and on the Building
> Permits, to be executed and delivered by the Debtor on or before the Initial
> Distribution Date, and (B) all Causes of Action.

93.     This language providing for a Tashmoo guarantee in the Draft Plan prepared by Riemer

did not appear in the First, First Amended, or the Second Amended Plans previously drafted by Riemer

and filed with the Court, despite the fact that its inclusion in the Draft Plan demonstrates that Riemer

knew how to structure such a provision to the extent such a construct were ever agreed upon.

94.     On February 1, 2008, the Court sustained the Debtor's objection to the $622,000 claim

of Ralph Tyler, allowing the claim in the amount of $3,070 and disallowing the balance.

I.      **Conversion from Chapter 11 to Chapter 7**

95.     By order dated January 23, 2009, the Chapter 11 case was converted to one under

Chapter 7 (the "Conversion Date").  The Trustee was appointed on January 26, 2009.

96.     The parties have stipulated, and accordingly I find, that Northwood's Estate in Chapter 7 has insufficient funds with which to pay administrative expenses, including *inter alia* the fees and expenses of Northwood's professionals that accrued during the period prior to the Conversion Date, which fees and expenses are subject to final allowance by the Court.  The extent of this insufficiency is entirely unclear.  The Trustee has submitted no evidence of the extent of funds that are available to pay claims in this case.  Nor has he adduced evidence of the extent of chapter 7 administrative claims. These must be paid in full before any payment can be made on administrative claims that accrued in the chapter 11 phase of the case, including Riemer's claim.  Nor has the Trustee adduced evidence as to the precise extent of unpaid chapter 11 administrative claims..

97.     Tashmoo has consistently denied any obligation to advance funds for payment of administrative claims and, therefore, has declined to pay or advance any amounts for the unpaid administrative claims of the Estate, either before or after the case was converted from Chapter 11 to Chapter 7.

**Jurisdiction**

In each of its four counts, the Trustee's adversary complaint is a proceeding to enforce a promise allegedly made at a confirmation hearing by a plan proponent as, in essence, an alleged oral addendum to the plan under consideration, to satisfy a confirmation requirement and thereby to gain the court's confirmation of that plan.  It arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by a standing order of reference (codified in the district court's local rules at L.R. 201, D. Mass.), referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1).  28 U.S.C. § 157(b)(2)(L) (core proceedings include confirmations of plans).  The bankruptcy court accordingly has authority to enter final judgment.

**Discussion**

The Trustee's complaint asserts four counts.

**Count I:  Breach of Contract**

In his first count, the Trustee contends that Hamlin, on behalf of Tashmoo, made an oral promise at the Confirmation Hearing to make a loan to Northwood of up to $2 million to fund the payment of administrative expenses of the estate that the Debtor had incurred and would incur in the chapter 11 phase of the case, both prior to and after confirmation; that the Court confirmed the Plan in reliance on this promise; that Tashmoo, as a plan proponent and owner and operator of Northwood, received a benefit from the Plan's confirmation; that Tashmoo has breached this promise; and that Northwood's bankruptcy estate has been damaged by this breach.

In this count, and in his post-trial briefing on it, the Trustee notably does not identify another party to this alleged contract.  Where the plaintiff fails to allege the existence of a counterparty to the contract, much less to identify the counterparty, this count fails to state a claim on which relief can be granted.  This count, sounding as it does in contract, fails at this very basic level.

This count also fails for the further reason that, as I have found, Tashmoo, through Hamlin, did not make an oral promise at the confirmation hearing to make a loan to Northwood to fund the payment of administrative expenses.  Through Hamlin, Tashmoo did promise that if the $622,000 claim of Ralph Tyler were allowed, Tashmoo would lend Northwood sufficient funds to enable it to pay the Tyler claim.  This obligation has not been triggered—all but $3,070 of Tyler's claim was disallowed, and the balance was well within Northwood's ability to pay without need of a loan—and the Trustee now seems to concede that this promise cannot be a basis for the relief he now seeks.  If he does not so concede, then, to be clear, I hold that it affords the Trustee no basis for the relief he seeks.  At most it would obligate Tashmoo to loan the Debtor sufficient funds to pay Tashmoo's claim.

Instead, the Trustee now relies on Hamlin's affirmative answer, as simple "yes," to the question: "Do you expect to be able to reach an agreement with the administrative claimants for payment over time or payment from another source like the – one of the other plan proponents?"  Hamlin's "yes" plainly was neither a promise nor an indication that an agreement then existed.  It was a mere indication of expectation: Hamlin affirmed that he *expected* to be able to reach an agreement.  It was not a promise to agree to either of the two mentioned options.  Nor was it a promise that, if agreement could not be reached for payment over time, then payment would be made by the other plan proponent, Tashmoo.  Hamlin did not say or imply:  if not A, then B.  Nor were A and B the only options.  The Plan itself supplied a third, default option:  that administrative claimants would receive payment from Northwood as soon as practicable after allowance from the sources enumerated in the Plan.  Hamlin himself testified:  "My understanding is that the administrative claimants will not be insisting on immediate payment," and Riemer voiced no disagreement with this testimony.  And Riemer confirmed Hamlin's understanding as correct by not objecting to confirmation for the Plan's failure to provide for immediate payment of administrative claims and for Northwood's inability to fund immediate payment of Riemer's claim; Riemer was obviously aware of these issues and elected not to interpose them as possible impediments to confirmation.  In short, the testimony in question is not a promise to fund the payment of administrative expenses, by loan to Northwood or otherwise.  Tashmoo did not make the promise on which this count and its alleged contract are predicated.

**Count II:  Promissory Estoppel**

Count II, based on a theory of promissory estoppel, is predicated on the same alleged promise as formed the basis of Count I.  Where the Court has found that Tashmoo did not make the alleged promise, this count, too, must be dismissed.

**Count III: Enforcement of Condition of Order of Confirmation**

In Count III, the Trustee alleges that Tashmoo, through Hamlin, made the same promise as forms the basis of Counts I and II; that the promise was critical to Northwood's ability to satisfy the requirements of confirmation in 11 U.S.C. § 1129(a)(9)(A) (treatment of administrative expenses) and (a)(11) (feasibility); that the Court relied on this promise in determining that these requirements were satisfied and thus in confirming the Plan; and, therefore, that the Court now can and should exercise its authority under 11 U.S.C. § 105(a) (authorizing court to issue any order necessary to carry out the provisions of the Bankruptcy Code) by compelling Tashmoo to honor its promise. This count, too, must be dismissed for the simple reason that, like the two previous counts, it requires a determination that Tashmoo made the alleged promise, but the Court has found that Tashmoo did not.

I do not understand the Trustee here to be making an alternate argument that the Confirmation Order preclusively determined the factual issue of whether Tashmoo, through Hamlin, made the alleged promise. The Trustee has not invoked the doctrine of collateral estoppel, otherwise known as issue preclusion, and certainly has not addressed its requirements. Nonetheless, he does argue that Judge Somma could not properly have determined that the requirements in § 1129(a)(9)(A) and (a)(11) were satisfied without finding that Tashmoo made the alleged promise; aside from this promise, the Trustee reasons, there was no evidence to support necessary findings (i) that the plan treated administrative expense claims as required by § 1129(a)(9)(A) and (ii) that Northwood had the wherewithal to timely make (among others) the payments required by § 1129(a)(9)(A) and thus satisfied the feasibility requirement in § 1129(a)(11).

I do not regard the Confirmation Order as having preclusively determined whether Tashmoo made the alleged promise.[1] A final order of a federal court has issue preclusive effect as to only those

---

[1] Judge Somma was not asked to make this specific finding and did not expressly make a finding as to whether Tashmoo had or had not made this alleged promise; his findings as to the requirements of § 1129(a)(9)(A) and (a)(11) were of a much more general and conclusive nature.

findings or rulings that (among other things) are essential or necessary to the court's holding.  *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978 1st Cir. 1995).  Contrary to the Trustee's position, however, the alleged promise was not necessary to make the findings required by subsections 1129(a)(9)(A) and (a)(11) and thus to support the Confirmation Order.  Subsection 1129(a)(9)(A) requires that a plan  provide that each holder of § 507(a)(2) claim—that is, an administrative expense claim—receive cash equal to the allowed amount of the claim "on the effective date of the plan."  11 U.S.C. § 1129(a)(9)(A).  But this requirement is subject to an exception:  the requirement of payment in full on the effective date applies "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim."  *Id*.  Here, Judge Somma had ample evidence from which he could have concluded that Riemer agreed to a different treatment; indeed, I doubt that he could have reached a different conclusion.  He had evidence showing that (i) Riemer, as Northwood's counsel, was well aware that the Plan provided that administrative claims, including Riemer's fee claim, would be paid as soon as practicable after allowance from the sources identified in the Plan, (ii) Riemer knew that the Northwood's liquid assets at the time of confirmation were insufficient to fund payment of Riemer's claim, (iii) Riemer knew that its administrative claim was the only one that Northwood was not then able to pay,  yet (iv) Riemer did not object to confirmation or to the Plan's treatment of its administrative claim, and (v) Riemer voiced no disagreement when Hamlin testified at the confirmation hearing that he understood that administrative claimants would not be insisting on immediate payment.  On this record, Judge Somma could, and likely did, conclude that Riemer had consented to a treatment differing from what would otherwise have been required by § 1129(a)(9)(A).  Riemer had unmistakably signaled that, if it was not able to work out a different payment arrangement with Tashmoo, it was content to accept payment when and as the liquidation of Northwood's assets permitted.  Judge Somma could have determined that § 1129(a)(9)(A) was satisfied in this manner.  And where § 1129(a)(9)(A) was satisfied by Riemer's agreement to the proposed treatment, the feasibility requirement in subsection 1129(a)(11)

would easily have been satisfied by a showing that the assets available for liquidation would be of

sufficient value to pay all claims (other than Tashmoo's) in full, of which there undisputedly was

evidence.  For these reasons, the alleged promise was not necessary to support the findings required by

subsections 1129(a)(9)(A) and (a)(11).

There is also a logical difficulty in the Trustee's position.  These is no insufficiency of other

evidence for the court to have confirmed the plan, but if there were, it would not follow that there

existed evidence to support a finding that Tashmoo made the alleged promise.  Only if the alleged

promise had in fact been made would it be possible for Judge Somma to have relied on it to justify

confirmation.  But Tashmoo did not make the alleged promise.  The absence of an alternate evidentiary

basis for confirmation is not itself sufficient to support a determination that Tashmoo made the alleged

promise.  For these reasons, I am satisfied that Count III must be dismissed on its merits.

**Count IV:  Equitable Estoppel to Deny Judicial Admission**

In Count IV, the Trustee seeks a determination that Tashmoo, having made a promise in the

Confirmation Hearing—the same alleged promise, to make a loan to Northwood of up to $2 million to

fund the payment of administrative expenses of the estate that the Debtor had incurred and would

incur in the chapter 11 phase of the case—on which the Court relied in confirming the plan, is now

estopped from denying that it made this promise, and, under the doctrine of judicial estoppel, may and

should be compelled to honor it.  The Court doubts that a promise is an admission or the taking of a

position, the kind of thing to which judicial estoppel might have any application.  But I need not reach

the issue.  At bottom, this count is a reiteration of Count III and, like Count III, requires proof that

Tashmoo made the alleged promise.  I have found that Tashmoo did not make the promise in question.

Nor has the Trustee established that Judge Somma relied on or needed to rely on such a promise in

confirming the plan.  Count IV must therefore be dismissed.

**Conclusion**

On the basis of the above findings and rulings, the Court will enter a separate judgment that

dismisses the complaint in its entirety.

Date:  September 3, 2014

Frank J. Bailey
United States Bankruptcy Judge